## CAMP & COMPTON, PLAINTIFFS IN ERROR, V. SAMUEL SADLER, DEFENDANT IN ERROR.

1.   **Action on Account:** VERDICT.   Where in an action on an account and set-off the testimony is nearly equally balanced, the verdict will not be set aside as being against the weight of evidence.

2.   **Sale:** ORAL ACCEPTANCE OF ORDER FOR GOODS.   Where there is testimony tending to show that an order in favor of one S., upon the firm of C. & C., was orally accepted by said firm, and paid to S. in goods, it is not error for the court to refuse to instruct the jury that, notwithstanding the oral acceptance of said order by C. & C., they could sue said S. for the value of the goods obtained by him upon said order.

ERROR to the district court for Harlan county.   Heard below before GASLIN, J.

*John Dawson, C. C. Flansburg,* and *Ryan Bros.*, for plaintiff in error, cited: *Birchell v. Neaster,* 36 Ohio State, 331.   *Dows v. Swett,* 120 Mass., 322.   *Reinheimer v. Carter,* 31 Ohio State, 579.

*James McNeny,* for defendant in error.

MAXWELL, CH. J.

This is an action on an account which the plaintiff claims to have against the defendant. The defendant, in his answer to the petition, denied the facts stated therein, and alleged that the plaintiffs were indebted to him in the sum of $70.29, upon an order from N. C. Christianson which they had accepted; also, for $37.50 for the rent of a building, $4 for an order which they had accepted from one McKooken, and $6.97 for drugs sold and delivered to the plaintiffs by the defendant. On the trial of the cause the jury returned a verdict in favor of the defendant for the sum of $16.56, upon which judgment was rendered.

W. L. Camp, one of the plaintiffs, being called as a witness, testified: "This is our book of original entries. I made most of the entries myself, and the goods were charged to Sadler. Before Compton and me went in together Sadler and me were dealing together, and I owed Sadler some, which I afterwards paid. He said he was about to make a trade with Christianson, and would bring an order from Christianson on us, and did not want the goods charged to him, but I said I would charge the goods to him, and if he brought the order from Christianson it would be all right, but he never brought an order. I think in July some time we were talking about the matter, and I told him to bring in the order, so we could settle the matter up. He said he had no order from Christianson. We were then looking over the books together. He said he had no order from Christianson, but he had a due-bill on Christianson. I said, that is a very different thing, and shut up the book. He said he wanted the balance of the goods at wholesale prices. Christianson was considered good at that time, but after he came and tried to press the matter I heard Christianson was failing. The amount due from

Sadler on the book foots up $82.71.  .There is a credit on order from McCorkle.    He has the same account himself."

On cross-examination he testified: "This is a book of continuous accounts, and the only book of accounts we have in connection with the business.    We kept no ledger, and Sadler and Christianson were the only ones we kept any continuous accounts with.    All others were just by the day.    The items were put down at or about the time Sadler got the goods.    Some of the goods I bought of Dr. Sadler, and some were·bought in Omaha.    Some time in July—I forget whether it was at the time he brought the McCorkle order or not—I told Sadler to bring the order from Christianson.    The amount of the Christianson order, when he commenced trading there, was about $50.    In some way I heard the doctor say that in some trade he was to have an order for about $50, and after that I heard he had another trade, by which he was to have another order.    Compton was about the store at the time of my talk with Sadler; could not say whether he was right by us or not.    I don't know that I ever heard any conversation between Compton and Christianson in regard to the delivery to Sadler of goods by our firm on account of Christianson.    When Christianson sold those goods to Compton he wanted to give some order, and said this: 'Any trade that I can throw you here it will be all right, and orders I send just charge them up.'    I think he said he was making a trade with Sadler.    Now there were some trades like that— where there was a difference—he wanted us to pay in money, and we did one of $15 or $20, and charged them to Christianson.    I don't know only about $15 or $20. Christianson said the man would want $15 or $20; in all, about $25 in goods and money.    Christianson said he was going north, and wanted us to attend to it.    In regard to the date I would not say, for I don't know whether it was July 28th or not, but I said, 'Ask Dr. Sadler for that order for $50 or $75 against us,' and he

said he had no order, but a due-bill of nearly $100, and that he was going to let Turner have it. I supposed he had an order, and I wanted the order so I could change the account from Sadler to Christianson. I don't know as I said, about July 28th or August 4th, that the goods we let him have were all right, but I said for him to bring an order and let me credit it, but he never brought it. The last item in the account, I did say to Sadler, we could not charge to Christianson's account. He said I might charge it to his individual account. I don't think he asked to have it charged to Christianson's account, the same as the other goods, because we had had quite a racket about it a few days before. He commenced suit against me for this due-bill for $100 or $150, and had an attachment suit. I don't remember whether or not this racket was about our not paying the balance of the goods. I don't know but he demanded the balance of the goods. I told him I was not buying notes on Christianson the last of July or first of August. It is not a fact that Sadler told me and Compton, about the time of this racket, that if we did not choose to let him have the goods to the amount of Christianson's order, or the amount of the balance of the $205, that he would go to the wholesale store of Christianson and take the balance out of that store; neither did Compton and I request him to let the matter rest, that his account would be all right, so far as I know; I never did. I was never present when Compton said so, either."

Q. Is it not a fact in July, 1883, you asked Mr. Allen to get an order from Dr. Sadler for some goods, saying that you were owing him on accounts of goods?

A. Allen came to me and asked if I would accept an order on Sadler, as he was owing him and wanted to get his pay. I refused to accept the order; that was all there was about it. In the first place he came and asked me about it, then it run along two or three weeks. In the first place I would have taken the order if he had had it, but at last I told him I would not.

On re-direct examination he testified: "I know Sadler got goods there and they were charged to him. The agreement between me and him was that he should pay for them. This is the account. Those items were delivered to him and he has never paid for them."

Dr. S. Sadler, the defendant, being called, testified: "I am the defendant. I never bought of the goods on that book from the sixth of June, not one dollar or one cent's worth, from Camp & Compton, except with the express understanding that it should be charged to N. C. Christianson, I will say with the exception of the last item of $15. This agreement between Camp & Compton, Christianson, and myself was on various accounts. One was a land trade by Christianson or his agent, Wintz, which was for $60. The first account I had against Christianson was some land sold to Wintz, by which Christianson was indebted to me $60. I was to receive $60 in goods, that were to be sent here to Camp & Compton. I asked Compton if it would be all right. He said it would be after the goods came. Afterwards we went to Camp & Compton and they said they would accept an order of that kind, and all others. This conversation was about the 5th or 7th of June, might have been before that time. The conversation when Wintz was with me was about the 6th or 10th of June. Wintz was acting as Christianson's agent through a power of attorney. On or about July 7, 1886, Camp & Compton were owing me $482 and some cents for a stock of drugs I had sold them; as a balance due me Camp gave me an order on Gardner for $475, which Gardner accepted. Then the balance was the amount of difference, six dollars and ninety-seven cents, on July 7, 1883, against Camp & Compton. I think Camp & Compton rented the building from me about April 15th; they had the building five months. They paid first two months' rent, the other three months' rent they refused to pay. I demanded it frequently. Compton

always said they would settle as soon as this matter here was settled. Just previous to the commencement of this suit, I made a demand, and they refused to pay it. I think the rent was to be paid monthly; there was no definite agreement. I think it was agreed they should pay monthly in advance. That was my understanding at any rate. It run from April 15th or 16th until the 15th of August; they have paid me $25." On cross-examination he testified: "There is due me for rent $37.50; on April 15th I have them charged with one month's rent in advance; also on May 15th, on June 15th, on July 15th, and on August 15th. I think June 15th they paid me $25. I think they paid me from August 15th in goods and some money for rent up to the last half month, which is unpaid. They paid me all rents after August 15th except the last half month. The receipt does say from June 16th to August 16th. I remember now. When he paid the two months' rent he wanted to make the receipt for the last two months of 'the five months then due. He said he wanted it that way and would fix it all right. I said it was all right so far as I was concerned. I had them charged with five months' rent on a certain day. They paid me for two months' rent, or $25."

Q. First you stated you had been paid by them from the 16th of April to the 16th of June, and your receipt shows payment from June 16th to August 16th.

A. Well, if they have receipts for the first three months that will end it. It may be possible, as I was testifying from memory and thought the payment was for the two months first due, but I remember now since you called my attention to it, that he made the receipt for the last two months. The reason why he did it I don't know. They still owe me $37.50 on rent, I think they paid me all but a half a months' rent; they paid me two month's rent out of the first five that was due. I recollect giving him a receipt for two months' rent, but he has no receipt for the

other three months.  The first rent he paid me was not a settlement of an old matter between me and Camp.  I recall now the reason he gave for taking the receipt for the last two months was for the very reason that at that time, it was about the time they took charge of these goods, and though Compton was part of the firm it did not so appear at the last two months.  I never authorized or told ·Camp & Compton to ever charge one dollar to me, and it was not charged to me as I understand it.  They should. have been charged to N. C. Christianson.  Christianson .owed me afterward, I took a due bill to settle up with him. Afterwards I think Christianson failed.

Q.  Did you ever attach the property of Christianson for this very account you are trying to get in here?

A.  I attached him and at the same time I think I attached Camp & Compton and Christianson.

Q.  You claimed then he owed you?

A.  Yes, sir.

Q.  And does yet?

A.  Yes, sir.

Q.  Then he is the fellow you would be after, if he had anything, is he not?

Objected to as immaterial, sustained, plaintiff excepts.

A.  I don't know whether or not this McCorkle order was ever paid or not.

On redirect examination he testified : "There has been none of the five months' rent paid, except $25.  The receipt dated January 9th, 1883, is a mistake in date, I just signed it as it was filled out.  This July receipt, showing payment from June 16th to August 16th, was so made to accommodate Camp."  He also testified that "There was nothing in particular unfriendly between us [them]."

There are other witnesses to corroborate the testimony of Camp, and also of Sadler, the testimony being nearly equally balanced.  It will thus be seen that there is a

direct conflict in the evidence as to the three months' rent for the building, and also in regard to the person to whom the credit was given for the goods purchased by Sadler. The question, therefore, was one proper to submit to the jury, and from the nature of the testimony it is impossible for this court to say that the verdict is wrong.

The plaintiffs asked the court to instruct the jury as follows: "The court further instructs you that if you find that at the time of the commencement of this action there was a valid and subsisting indebtedness existing in favor of Samuel Sadler and against N. C. Christianson, and that said N. C. Christianson gave orders on Camp & Compton to Samuel Sadler, although you may find that said orders were orally accepted by Camp & Compton, yet you will find for the plaintiffs." This instruction was refused, to which the plaintiffs excepted and now assign the failure to give the same as error.

If Christianson gave orders in favor of Sadler on Camp & Compton, which they accepted and paid by the sale of goods to Sadler, there would be no liability on the part of Sadler to pay for such goods unless he was liable as principal debtor or guarantor. In other words, if a party upon whom an order is drawn accepts the same and thereupon proceeds to pay the amount of the order to the person in whose favor it is drawn, the presumption is that the credit was given to the drawer of the order, unless the holder by some acts of his own renders himself liable, of which there is no proof in this case.

There is no material error in the record, and the judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.